```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
UNITED STATES OF AMERICA,           :
                                    :        11 Cr. 0079(JSR)
                                    :
          -v-                       :        OPINION AND ORDER
                                    :
ADAM SMITH,                         :
                                    :
          Defendant.                :
------------------------------------x
```

JED S. RAKOFF, U.S.D.J.

Petitioner Adam Smith pled guilty on January 26, 2011 to one count of conspiracy to commit securities fraud and one count of securities fraud. See Declaration of Michael S. Feldberg in Support of Adam Smith's Motion Pursuant to 28 U.S.C. § 2255 and 1651 (Feldberg Declaration), Dkt. 18, Exhibit A (Information); Feldberg Declaration, Exhibit B (Plea Allocution Transcript). The basic charge was that Mr. Smith, while working as portfolio manager or analyst at the Galleon Group ("Galleon"), obtained material, non-public information from various insiders at publicly-traded companies and financial services firms, shared this information with others at Galleon, and used this information to trade securities in accounts affiliated with Galleon. See Information ¶¶ 3, 12-15.

Mr. Smith pled guilty to these charges pursuant to a cooperation agreement dated January 21, 2011. See Feldberg

1

Declaration, Exhibit C (cooperation agreement). As a Government cooperator, Mr. Smith testified at the trial of Galleon manager Raj Rajaratnam in March 2011. See Memorandum of Law in Support of Adam Smith's Motion Pursuant to 28 U.S.C. §§ 2255 and 1651 ("Pet. Br."), Dkt. 17, at 1; Government's Memorandum of Law in Opposition to Petitioner's Motion for Habeas Relief or for a Writ of Error Coram Nobis ("Gov't Opp. Br."), Dkt. 21, Exhibit 1 (Government's Sentencing Letter), 11-15. The Government also prepared Mr. Smith to testify at the trial of former Goldman Sachs director Rajat Gupta in June 2012, but did not ultimately call him. See Pet. Br. at 1; Government's Sentencing Letter, 15-16. On June 26, 2012, this Court sentenced Mr. Smith to two years' probation, a $15,000 fine, a $200 assessment, and a $105,300 forfeiture. See Judgment, Dkt. 12. The Court entered final judgment on July 3, 2012, and Mr. Smith did not appeal. Mr. Smith completed his term of probation on or about February 7, 2014. See Probation Form Petition, Dkt. 15; Gov't Opp. Br. at 8.

On December 7, 2015, Mr. Smith filed the instant petition for habeas relief or, in the alternative, a writ of error coram nobis. Mr. Smith argues that he is entitled to such relief as a result of the Second Circuit's decision in United States v. Newman, 773 F.3d 438 (2d Cir. 2014), cert. denied, 136 S. Ct.

242 (Oct. 5, 2015). In Newman, the Second Circuit held, as had this Court previously, see United States v. Whitman, 904 F. Supp. 2d 363, 370-72 (S.D.N.Y. 2012), that "in order to sustain a conviction for insider trading, the Government must prove beyond a reasonable doubt that the tippee knew that an insider disclosed confidential information and that he did so in exchange for a personal benefit." Newman, 773 F.3d at 442. The Second Circuit further stated, however, that a tipper's provision of a personal benefit to a tippee could be inferred from a personal relationship between the tipper and tippee only if there is "proof of a meaningfully close personal relationship that generates an exchange that is objective, consequential, and represents at least a potential gain of a pecuniary or similarly valuable nature." Newman, 773 F.3d at 452. According to Mr. Smith, there is no evidence that any such personal benefit existed in his case, and so there is no evidence that he violated insider trading law as characterized in Newman. See Pet. Br. at 7-8. The Court finds, however, that Mr. Smith is ineligible for either habeas or coram nobis relief, and so denies his petition.

As to Mr. Smith's habeas petition, 28 U.S.C. § 2255(a) provides that "[a] prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released

upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States . . . or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence." Therefore, to be eligible for habeas relief pursuant to 28 U.S.C. § 2255, petitioner Smith must show that he is "in custody." The Government contests whether Mr. Smith is "in custody." See Gov't Opp. Br. at 9-11.

Being "in custody" for habeas purposes is not limited to physical confinement, for "besides physical imprisonment, there are other restraints on a man's liberty, restraints not shared by the public generally, which have been thought sufficient in the English-speaking world to support the issuance of habeas corpus." Jones v. Cunningham, 371 U.S. 236, 240 (1963). Such restraints "significantly restrain [a] petitioner's liberty to do those things which in this country free men are entitled to do." Id. at 243. So, for example, "[p]ost-release supervision, admitting of the possibility of revocation and additional jail time, is considered to be 'custody.'" Earley v. Murray, 451 F.3d 71, 75 (2d Cir. 2006).

However, "habeas corpus is an extraordinary remedy," and "[t]he custody requirement of the habeas corpus statute is designed to preserve the writ of habeas corpus as a remedy for

4

severe restraints on individual liberty." Hensley v. Municipal Court, 411 U.S. 345, 351 (1973). Notably, "once the sentence imposed for a conviction has completely expired, the collateral consequences of that conviction are not themselves sufficient to render an individual 'in custody' for the purposes of a habeas attack upon it." Maleng v. Cook, 490 U.S. 488, 492 (1989).

In the instant case, petitioner Smith argues that he is "in custody," within the meaning of 28 U.S.C. § 2255, because "[i]n connection with his plea agreement, the Securities and Exchange Commission filed a parallel civil case," in which final judgment was entered, on consent, on May 28, 2011. Pet. Br. at 10; see Feldberg Declaration, Exhibit E (Consent and Final Judgment). As part of a related administrative proceeding, Mr. Smith agreed to be permanently barred from the securities industry. See Pet. Br. at 11.[1] Even though, as Mr. Smith acknowledges, the securities industry bar "stems from the SEC Settlement," and Mr. Smith is not currently attempting to overturn that civil settlement, "[a]s a practical matter, Mr. Smith's chances of successfully applying to lift the industry bar would be significantly enhanced if his criminal conviction were vacated." Pet. Br. at 11 n.1.

---

[1] Mr. Smith does not provide specific documentation of the securities industry bar and the administrative proceeding that gave rise to it, but the Government does not challenge his contention that such a bar exists. See Gov't Opp. Br. at 10, 23.

The Court finds, however, that Mr. Smith is not "in custody" within the meaning of 28 U.S.C. § 2255. Mr. Smith has cited no case holding that being barred from a certain industry, especially as a result of a settlement in a parallel civil case, satisfies the custody requirement. To the contrary, Mr. Smith's bar from the securities industry is precisely the kind of "collateral consequence" of conviction that does not "render an individual 'in custody' for the purposes of a habeas attack." Maleng, 490 U.S. at 492.

The Second Circuit has held that the custody requirement is not satisfied, for example, by "removal from the bench of the Nassau Family Court, revocation of [petitioner's] professional license to practice law, and his disqualification from being licensed as a real estate broker or insurance agent." Ginsberg v. Abrams, 702 F.2d 48, 49 (2d Cir. 1983) (per curiam); see also Lefkowitz v. Fair, 816 F.2d 17, 20 (1st Cir. 1987) (holding that the revocation of a medical license by a state agency does not fulfil the custody requirement). Also notable is that "one held in immigration detention is not 'in custody' for the purpose of challenging a state conviction under [28 U.S.C.] § 2254." Ogunwomoju v. United States, 512 F.3d 69, 74-75 (2d Cir. 2008). Against this background, the Court sees no basis on which to

conclude that the securities industry bar imposed on Mr. Smith fulfils the custody requirement for habeas relief.[2]

Furthermore, even if the Court were to assume, contrary to fact, that Mr. Smith was somehow still "in custody," he still would not have a viable claim for habeas relief. As the Government notes, and as petitioner does not deny, petitioner did not raise the points he now raises (about lack of evidence of personal benefit) at the time of his plea or on direct appeal. See Gov't Opp. Br. at 14. "Where a defendant has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in habeas only if the defendant can first demonstrate either cause and actual prejudice, . . . or that he is actually innocent." Bousley v. United States, 523 U.S. 614, 622 (1998) (internal quotation marks omitted).

In this regard, the Court first addresses the issue of whether Mr. Smith can show "cause." A "claim that is so novel that its legal basis is not reasonably available to counsel may constitute cause for a procedural default." Bousley, 523 U.S. at 622 (internal quotation marks omitted). The Second Circuit has

---

[2] It should be noted, moreover, that another difficulty with Mr. Smith's argument that he is "in custody" is that it is not clear that overturning Mr. Smith's criminal conviction would lead to the vacating of the securities industry bar resulting from an administrative proceeding related to Mr. Smith's settlement of the parallel civil case. See Pet. Br. at 10-11; Lefkowitz, 816 F.2d at 20 ("it is nowhere clear from the record that vacatur of [petitioner's] conviction will ipso facto insure restoration of his medical license.").

7

also declined to apply "the general rule denying relief because of a procedural default" when "a subsequent change in the law has resulted in a petitioner's conviction and punishment [having been imposed] for an act that the law does not make criminal." Brennan v. United States, 867 F.2d 111, 117 (2d Cir. 1989) (internal quotation marks omitted). In this case, petitioner Smith claims that "there is a significant risk" that his conduct was not criminal, since there is no evidence that Mr. Smith's tippers were provided with "personal benefit" as described in Newman, and that his plea agreement was not knowing or voluntary because he could not have anticipated the Newman decision. See Pet. Br. at 11.

The Court declines, however, to accept Mr. Smith's argument regarding "cause." Mr. Smith cannot show that he "lacked the relevant tools with which to raise his . . . claim on direct appeal." Jackson v. Leonardo, 162 F.3d 81, 84 (2d Cir. 1998). As this Court has previously held, "Newman could not, and did not, overturn any prior precedent regarding the meaning of 'personal benefit.'" United States v. Whitman, 115 F. Supp. 3d 439, 444 (S.D.N.Y. 2015). Arguments about the requirements for establishing personal benefit, many rooted in the long-established Supreme Court decision Dirks v. S.E.C., 463 U.S. 646 (1983), were scarcely novel at the time of Mr. Smith's guilty

8

plea. See, e.g., S.E.C. v. Anton, No. 06-cv-2274, 2009 WL 1109324, at *9 (E.D. Pa. Apr. 23, 2009); S.E.C. v. Maxwell, 341 F. Supp. 2d 941, 948 (S.D. Ohio 2004). Indeed, petitioner Smith was questioned at the trial of Raj Rajaratnam, approximately two months after Mr. Smith pled guilty, about any assistance or benefits that he and Galleon provided to his tippers. See Rajaratnam Trial Transcript ("Tr.") 2508:7-2509:24; 2804:21-2806:14. These questions evidently sought to elicit testimony on whether a benefit was provided to Mr. Smith's tippers in exchange for inside information and, if so, what benefit was supplied. All of this shows that arguments based on evidence of personal benefit were "reasonably available" to petitioner Smith and that he cannot establish cause for procedural default. See Bousley, 523 U.S. at 622.

Mr. Smith also cannot prove his "actual innocence." He argues that "there is no evidence of a quid pro quo or any consequential benefit received by a tipper in exchange for Inside Information." Pet. Br. at 14. But the Court finds that there is evidence that the tips Mr. Smith received involved a personal benefit meeting the Newman standard. Some of the evidence relates to tips from Michael Tomlinson, an Intel insider. The Government's sentencing letter - in a discussion of Mr. Smith's criminal conduct that Mr. Smith did not challenge at

9

the time of his sentencing – states that Mr. Smith solicited inside information from sources including "Michael Tomlinson, an employee of Intel Corporation." Government's Sentencing Letter at 2. The sentencing letter explains that in late 2004 or early 2005, Mr. Smith, after receiving Mr. Rajaratnam's approval, entered into an arrangement with Mr. Tomlinson whereby Mr. Tomlinson would provide inside information regarding Intel's earnings, and "[i]n exchange, . . . Galleon [would] pay Mr. Tomlinson a consulting fee, with the money to be directed to a third party controlled by Tomlinson." Id. at 4. Petitioner Smith testified to the existence of this arrangement at Mr. Rajaratnam's trial. See, e.g., Tr. 2459:4-2466:1. The arrangement with Mr. Tomlinson easily meets the Newman standard of "an exchange that is objective, consequential, and represents at least a potential gain of a pecuniary or similarly valuable nature." Newman, 773 F.3d at 452.

Though petitioner Smith concedes – as he must – that the Tomlinson matter "did involve a benefit," Pet. Br. at 7, he attempts to minimize the relevance of these tips to the instant motion. In particular, Mr. Smith contends that the Tomlinson matter "(a) was not mentioned in the Information; (b) was not mentioned during Mr. Smith's plea Allocution; and (c) did not involve the purchase or sale of securities." Pet. Br. at 7. The

10

Court, however, finds these arguments to be unavailing. The Information charged Mr. Smith with participating, from 2003 through 2009, "in a scheme to defraud by obtaining, sharing and disclosing material, nonpublic information . . . and/or executing securities transactions based on Inside Information pertaining to various companies . . . for the purpose of executing profitable securities transactions in accounts affiliated with Galleon, and with knowledge that the Inside Information had been disclosed in violation of duties of trust and confidence." Information ¶ 12. Though the Information did not specifically name Intel tips and named other tips, see Information ¶ 13, the tips from Mr. Tomlinson fit directly into the scheme described in Information ¶ 12.[3]

Moreover, although the tips from Mr. Tomlinson were not mentioned by name in Mr. Smith's plea allocution, Mr. Smith pled guilty pursuant to the cooperation agreement, which provided immunity to Mr. Smith for "securities fraud and conspiracy to commit securities fraud, from in or about 2003 through in or about 2009, as charged in Counts One and Two of the Information . . ." Cooperation Agreement at 2. In light of this grant of immunity, it is highly implausible that the charges in the Information did not incorporate the arrangement with Mr.

---

[3] Mr. Smith testified that Mr. Tomlinson began to provide him with Intel's earnings information at the end of 2004 or the beginning of 2005. See Tr. 2465:18-21.

Tomlinson. At Mr. Rajaratnam's trial, Mr. Smith testified that his "understanding of what the government is saying they will do" in his cooperation agreement was, "if I provide truthful testimony, that they won't further prosecute me for activities between '03 and '09, as well as activities in 2010, other than the two counts that I pled guilty to." Tr. 2721:16-20. Mr. Smith, who was represented by experienced defense counsel, would scarcely have pled guilty pursuant to the cooperation agreement if he had not been granted immunity to insider trading activity about which Mr. Smith openly testified in court. See Gov't Opp. Br. at 18; Tr. 2465-69.

Petitioner's other arguments against the Tomlinson tips as evidence of personal benefit are equally unsupported. For example, though Mr. Smith argues that there is no "evidence of a purchase or sale of Intel in connection with information provided by Mr. Tomlinson," Pet. Br. at 8, this does not show Mr. Smith's "actual innocence," since the "illegality of [a conspiracy] does not depend upon the achievement of its goal and it therefore does not matter that the ends of the conspiracy were from the beginning unattainable." United States v. Shellef, 507 F.3d 82, 105 (2d Cir. 2007) (internal quotation marks omitted). The Tomlinson arrangement was therefore not "different from the conspiracy charged," as petitioner Smith asserts. Pet.

Br. at 8. Furthermore, the fact that the information Mr. Tomlinson provided "turned out to be inaccurate" and the arrangement was discontinued, see Tr. 2815:24-2816:2, Pet. Br. at 8, is immaterial to whether an exchange took place that "represent[ed] at least a potential gain of a pecuniary or similarly valuable nature." Newman, 773 F.3d at 452. The Court therefore determines that in light of evidence regarding the Tomlinson tips, petitioner Smith has failed to demonstrate his actual innocence. He has also not shown that his conviction was imposed "for an act that the law does not make criminal." Brennan, 867 F.2d at 117.

Indeed, even independent of the Tomlinson tips, petitioner Smith has not made these showings. Mr. Smith admits – and the Information alleged – that he obtained material, non-public information from Kamal Ahmed, an investment banker at Morgan Stanley, and that he and others at Galleon traded on the basis of this information. See Pet. Br. at 4; Information ¶¶ 4, 13, 15. These tips were specifically mentioned in Mr. Smith's plea allocution; see Plea Allocution Transcript at 23:21-25. At Mr. Rajaratnam's trial, Mr. Smith testified that when he left Morgan Stanley to join Galleon, he stayed in touch with his former colleague Kamal Ahmed. See Tr. 2484:5-13. Mr. Smith also testified that he and Mr. Ahmed were "friends," that Mr. Smith

13

saw Mr. Ahmed when he made trips to California, and that the two spoke on the phone. See Tr. 2484:15-2485:5. Especially relevant is that in response to a question about what, if anything, Mr. Smith did to help Mr. Ahmed's business, Mr. Smith testified:

> I had a number of conversations with him through the time that I was at Galleon about the market. I would tell him my thoughts about what was going on in the market and what issues there were in the marketplace with regard to certain stocks, and I expected that he would use that information to help in his communications with those executives to try and win business. If he was better educated about current issues, he would be more fluent and appear more experienced. . . . I also had provided some introductions to him to executives of companies when he had requested one in particular, and to the extent that I had conversations with executives at technology companies and the subject came up, I would tell them my thoughts, that he was a good banker and a good person, a good person to do business with. . . .
>
> At times after 2007 when Galleon had launched a fund which had some focus on private companies or companies that were going to become public, I also helped Kamal to be part of conversations with companies that Galleon was potentially looking to invest in so that he could be part of those deals. . . .
>
> If we were an investor in a private company, we would have influence over which bank was selected to represent that company were it to go public. So while we wouldn't be the actual customer, we being Galleon, there was a potential that we could influence the decision about which bank was selected for any future deal.

Tr. 2508:9-23; 2508:25-2509:4; 2509:12-17.

Though petitioner contends that his assistance to Mr. Ahmed resembles the "career advice" deemed insufficient for an

14

inference of personal benefit in Newman, 773 F.3d at 453, see Pet. Br. at 6, his assistance to Mr. Ahmed actually extended beyond such casual help. Mr. Smith testified that he made introductions of Mr. Ahmed to executives of companies, when "Ahmed's job was to win banking business," Tr. 2509:19, and that he brought Mr. Ahmed into conversations with companies in which Galleon might invest, when "there was a potential that we could influence the decision about which bank was selected for any future deal." Tr. 2509:16-17.[4] Mr. Smith's assistance to Mr. Ahmed was directed to a key business objective of Mr. Ahmed's, namely, garnering banking business for Morgan Stanley. Mr. Smith's discussion of particular stocks with Mr. Ahmed was also geared toward enhancing Mr. Ahmed's standing among business executives, a significant constituency for Mr. Ahmed. Though the sufficiency of these benefits under Newman is a somewhat closer call than those involving Mr. Tomlinson, the Court determines that they meet the standard of "an exchange that is objective, consequential, and represents at least a potential gain of a

---

[4] Though Mr. Smith testified on cross-examination at the Rajaratnam trial that he "no ability to determine" which investment bank was hired on a particular deal at the time he provided introductions for Mr. Ahmed, see Tr. 2805:11-17, Mr. Smith did not recant the testimony, which he had given on direct examination, that there was "a potential that we could influence the decision about which bank was selected for any future deal." Tr. 2509:16-17. For purposes of the instant motion, Mr. Smith need not have had a definite ability to influence such decisions, since Newman refers to "an exchange that is objective, consequential, and represents at least a potential gain of a pecuniary or similarly valuable nature." Newman, 773 F.3d at 452 (emphasis added).

pecuniary or similarly valuable nature." Newman, 773 F.3d at 452.[5] Therefore, the Court finds that even beyond the Tomlinson tips discussed supra, in light of evidence of personal benefit in relation to the Ahmed tips, Mr. Smith has demonstrated neither that he is actually innocent, nor that his conviction was imposed "for an act that the law does not make criminal." Brennan, 867 F.2d at 117. Consequently, the Court denies Mr. Smith's motion for habeas relief pursuant to 28 U.S.C. § 2255.

Mr. Smith moves, in the alternative, for a writ of error coram nobis. 28 U.S.C. § 1651, the All Writs Act, provides that "[t]he Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." The writ of error coram nobis, which may be issued pursuant to this provision, is "essentially a remedy of last resort for petitioners who are no longer in custody pursuant to a criminal conviction and therefore cannot pursue

---

[5] Petitioner Smith emphasizes that he testified on cross-examination that in 2005, he "had not offered [Mr. Ahmed] any benefit for information that Mr. Ahmed gave [him] at that time," Tr. 2806:9-14; Pet. Br. at 7, 18. However, Mr. Smith clarified this point on redirect, testifying in answer to the question "[W]hat kind of things did you do for Mr. Ahmed back in 2005 when he gave you the tip . . .?" as follows: "I gave him my opinion about certain companies. . . . Also, from time to time if I had an opportunity to speak to executives at technology companies that I knew Mr. Ahmed had a relationship, I would put in a good word." Tr. 2988:20-23. There is clearly evidence, therefore, that Mr. Smith was providing assistance to Mr. Ahmed in 2005. Moreover, as this Court has previously held, "Newman, like Dirks, defines personal benefit in terms of expected or potential benefit as well as benefit actually received." Whitman, 115 F. Supp. 3d at 446.

direct review or collateral relief by means of a writ of habeas corpus." Fleming v. United States, 146 F.3d 88, 89-90 (2d Cir. 1998) (per curiam).

Significantly, the writ of error coram nobis is an "extraordinary remedy" applicable "only under circumstances compelling such action to achieve justice." United States v. Morgan, 346 U.S. 502, 511 (1954). "Coram nobis is not a substitute for appeal, and relief under the writ is strictly limited to those cases in which errors . . . of the most fundamental character have rendered the proceeding itself irregular and invalid." Foont v. United States, 93 F.3d 76, 78 (2d Cir. 1996) (internal quotation marks omitted). Moreover, "[t]he proceedings leading to the petitioner's conviction are presumed to be correct, and the burden rests on the accused to show otherwise." Id. at 78-79. The Supreme Court has stated that "[t]o confine the use of coram nobis so that finality is not at risk in a great number of cases, we were careful in Morgan to limit the availability of the writ to extraordinary cases presenting circumstances compelling its use to achieve justice." United States v. Denedo, 556 U.S. 904, 911 (2009) (internal quotation marks omitted).

In light of this high standard, a petitioner seeking a writ of error coram nobis "must demonstrate that 1) there are

17

circumstances compelling such action to achieve justice . . . 2) sound reasons exist [] for failure to seek appropriate earlier relief, . . . and 3) the petitioner continues to suffer legal consequences from his conviction that may be remedied by granting of the writ." Foont, 93 F.3d at 79 (internal quotation marks omitted). The Government contends, in its brief on the instant motion, that cause and prejudice analysis should apply to Mr. Smith's petition for a writ of error coram nobis. See Gov't Opp. Br. at 13. However, the Court need not address this issue, for whether or not cause and prejudice analysis ought to apply to such petitions, the Court holds that petitioner Smith has not met the requirements for coram nobis relief, as enumerated, for example, in Foont.

In particular, there are no "circumstances compelling such action to achieve justice," Morgan, 346 U.S. at 511, for the same reasons enumerated in the discussion of Mr. Smith's habeas petition. As explained supra, there was evidence that the tips in Mr. Smith's case did involve personal benefit and are by no means insufficient for Mr. Smith to be criminally liable post-Newman. Mr. Smith testified in open court, after all, that he facilitated an arrangement to pay an insider for providing non-

18

public material information. See Tr. 2459:4-2466:1.[6] Consequently, the Court declines to find that petitioner Smith's case warrants imposition of the "extraordinary remedy" of coram nobis relief, Morgan, 346 U.S. at 511, especially in light of the fact that "relief under the writ [of error coram nobis] is strictly limited to those cases in which errors . . . of the most fundamental character have rendered the proceeding itself irregular and invalid." Foont, 93 F.3d at 78 (internal quotation marks omitted).

For these reasons, the Court denies Mr. Smith's petition for a writ of habeas corpus or, in the alternative, a writ of error coram nobis. Since petitioner's motion makes no substantial showing of a denial of a constitutional right, a certificate of appealability will not issue. See 28 U.S.C. § 2253.

The Clerk of Court is directed to close docket entry 16.

Dated:     New York, NY
           March 24, 2016                    _____
                                             JED S. RAKOFF, U.S.D.J.

---

[6] The Government also raises doubts as to whether petitioner Smith "continues to suffer legal consequences from his conviction that may be remedied by granting of the writ," Foont, 93 F.3d at 79, see Gov't Opp. Br. at 22-24, but the Court finds that there is ample basis for denying his petition for a writ of error coram nobis independently of this point.

19